UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| ADAM FLANDERS, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | 1:19-cv-00283-GZS |
| | ) | |
| ATHENAHEALTH, INC., | ) | |
| | ) | |
| Defendant | ) | |

## RECOMMENDED DECISION ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff asserts claims against Defendant, his former employer, for discrimination and breach of contract.  Defendant has moved for motion for summary judgment on all claims. (Motion, ECF No. 25.)

Following a review of the summary judgment record and after consideration of the parties' arguments, I recommend the Court grant Defendant's motion.

### SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "After the moving party has presented evidence in support of its motion for summary judgment, 'the burden shifts to the nonmoving party, with respect to each issue on which he has the burden of proof, to demonstrate that a trier of fact reasonably could find in his favor.'"  *Woodward v. Emulex Corp.*, 714 F.3d 632, 637 (1st Cir. 2013) (quoting *Hodgens v. Gen. Dynamics Corp*., 144 F.3d 151, 158 (1st Cir. 1998)).

A court reviews the factual record in the light most favorable to the non-moving

party, resolving evidentiary conflicts and drawing reasonable inferences in the non-movant's favor. *Perry v. Roy*, 782 F.3d 73, 77 (1st Cir. 2015). If a court's review of the record reveals evidence sufficient to support findings in favor of the non-moving party on one or more of his claims, a trial-worthy controversy exists and summary judgment must be denied as to any supported claim. *Id.* ("The district court's role is limited to assessing whether there exists evidence such that a reasonable jury could return a verdict for the nonmoving party." (internal quotation marks omitted)). Unsupported claims are properly dismissed. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).

## FACTUAL BACKGROUND

Prior to joining Defendant as a Client Services Analyst in Defendant's Belfast, Maine, Customer Service Center (CSC), a call center, in September 2014, Plaintiff was diagnosed with depression, anxiety, and seasonal affective disorder. (DSMF ¶ 1.)[1] Defendant contends that Plaintiff did not disclose his medical conditions to it at the time of his hire. (*Id.*)

At the start of Plaintiff's employment, he and a representative of Defendant signed an Employment Agreement that, among other terms, specified that Plaintiff was an "at-will" employee. (DSMF ¶ 71.) The Employment Agreement further provided that its terms

---

[1] Reference to the parties' statements of fact is as follows: Joint Stipulation of Facts (JSF, ECF No. 24-1), Defendant's statement of material facts (DSMF, ECF No. 26); and Plaintiff's opposing statement of facts (POSMF, ECF No. 36). In its reply statement of material facts (ECF No. 40), Defendant objects to Plaintiff's responses to some of Defendant's statements, and requests that the responses be stricken. I have assessed the materiality of the parties' respective denials and qualifications, as well as any other alleged deficiencies in the factual assertions, and the result of that assessment is reflected in the recitation of the facts and the analysis of the motion for summary judgment.

could be amended only through a subsequent written agreement signed by both parties. (*Id*.)

In late August 2015, Plaintiff suffered a severe depressive episode and was briefly hospitalized.   (JSF ¶ 14.)   In a September 9, 2015, email to Defendant's benefits department, Plaintiff explained that he recently needed to miss several days of work due to medical issues relating to his depression. (JSF ¶ 15.) Defendant responded the following day and suggested that Plaintiff file for an intermittent leave of absence with Matrix Absence Management ("Matrix"), Defendant's third-party leave administrator. (*Id*.) Plaintiff applied to have his absences approved as medical leave, and Matrix approved Plaintiff's leave of absence from August 27, 2015 through September 8, 2015.  (JSF ¶ 16.)[2]

While employed with Defendant, Plaintiff received an overall rating of "meets expectations" on his performance reviews in each year of his employment (2014, 2015 and 2016). (DSFM ¶ 2.)  Plaintiff alleges, however, that his manager repeatedly complained of his tardiness in arriving to work and in returning from breaks.  (POSMF ¶ 2.)

At some point before September 2015, Plaintiff asked to work part-time (i.e., work four days each week for a total of 32 hours); Defendant granted his request. (DSMF ¶ 3.) When he made the request, he said it was because he felt "overwhelmed" by the call volume of the CSC; Plaintiff does not recall whether he linked his request to a medical diagnosis or whether a medical provider recommended he work reduced hours. (DSMF ¶ 4.)

Plaintiff began working on the Technical Innovation and Support (TIES) team in

---

[2] Defendant had access to Plaintiff's leave of absence claim through Matrix.  (Defendant's Reply Statement of Material Facts ¶ 79.)   Defendant maintains that Matrix at no time provided any information or documentation to Defendant describing or reflecting Plaintiff's medical condition.  (*Id*.)

2015, where his initial supervisor was Justin Richards, and his team lead was Joseph Dunphy. (DSMF ¶ 5.) Dunphy was the most senior member of the TIES team, reporting to Richards.  Dunphy directed the workflow of the TIES team and acted as an informational resource for the team members. (DSMF ¶ 6.)  Plaintiff contends that Dunphy acted like an assistant manager, reaching out to other teams and determining work schedules and discussing Plaintiff's career development; Defendant maintains that Dunphy did not have the authority to hire, fire, demote, promote, transfer, or discipline any employees, and did not play any role in evaluating an employee's performance.  (DSMF ¶ 7; POSMF ¶ 7.)

Throughout 2016, Plaintiff discussed with Dunphy his desire to move to another team that did not involve call work. (DSMF ¶ 8.)  Plaintiff explained that he found it "overwhelming" and "stressful" to handle customer calls, and that he preferred to move to another team where he could focus more on technical work, which he felt would reduce his stress level. (DSMF ¶ 9.)

Dunphy was not surprised by Plaintiff's requests to move to another team, as reports of stress in relation to call work are common.  (DSMF ¶ 10.)  Plaintiff did not explain that his stress was related to a medical condition. (DSMF ¶ 11.)[3]  During 2016, Plaintiff and Dunphy also discussed the possibility of Plaintiff obtaining a position in another of Defendant's offices. (DSMF ¶ 12.)  Plaintiff and Dunphy discussed the possibility of a position in Defendant's office in Chennai, India, but there were no specific opportunities available in that office for a United States-based employee. (DSMF ¶ 13.)

---

[3] In his deposition, Plaintiff testified that he discussed his seasonal affective disorder with Dunphy in the context of moving his desk nearer to a window.  (Plaintiff's Dep. 55:6-56:10, ECF No. 27.)

Plaintiff also expressed interest in a temporary assignment on a small, start-up team based in Manila, the Philippines, to train a group of employees of a Manila-based vendor on customer support calls. (DSMF ¶ 14.)  Plaintiff would have required additional training for the position. (*Id*.) Plaintiff believes he spoke briefly with Kelly Dionne, the hiring manager for the Manila position, and Dunphy also spoke with Dionne to discuss Plaintiff's interest in the position. (DSMF ¶ 15.)  Near the end of May 2016, Dunphy told Plaintiff that Dionne reported that Plaintiff was not a good fit for the Manila position at the moment because he did not have all of the content-area expertise and training needed for the assignment, that Plaintiff should attempt to gain additional experience and training in other product areas, and that Plaintiff should make himself more well-known outside of the TIES team and within the core of the CSC. (DSMF ¶ 16.)  Plaintiff asserts that the training he required for the Manila position was not available to him.  (POSMF ¶ 16.)

Plaintiff alleges that Dunphy also told him of Dionne's impression that Plaintiff's personality was not outgoing and extroverted enough and that his voice was too monotone and quiet. (DSMF ¶ 17.) Dionne had no knowledge of Plaintiff's medical conditions and did not know that Plaintiff had a medical condition.  (DSMF ¶ 18.)

Plaintiff was also interested in a position in Defendant's San Francisco office, but he could not identify any vacant positions in that office in 2016 or 2017 for which he was qualified.  (DSMF ¶ 19.)  At various points in 2016 and early 2017, Plaintiff also inquired about the possibility of obtaining a remote position allowing him to work from California or from his home in Maine, but he did not find a remote position for which he was qualified. (DSMF ¶ 20.)

Defendant maintains that Dunphy never made any promises to Plaintiff regarding a transfer. (DSMF ¶ 22.)  Plaintiff contends that Dunphy made assurances that by performing additional work, taking on a full-time schedule, and shadowing for other teams, Plaintiff would get a position with another team. (POSMF ¶ 22.)

Plaintiff continued to perform well on the TIES team, although his tardiness remained an issue, and his evident lack of enthusiasm was noted by his manager. (DSMF ¶ 23; POSMF ¶ 23.)  In late 2016, Jessica Patrick became Plaintiff's manager and direct supervisor. (DSMF ¶ 24.)  Shortly thereafter, Patrick discovered that he had been incorrectly coded as a full-time employee in Defendant's payroll system and therefore had been erroneously accruing paid time off (PTO) and holiday pay on a full-time basis. (DSMF ¶ 25.)  On November 28, 2016, Patrick informed Plaintiff of the issue, and told him that to correct the error, Plaintiff could retain his current part-time work schedule, in which case his PTO and holiday pay would be correspondingly reduced, or he could increase his work schedule to full-time, in which case his PTO and holiday pay would remain the same. (DSMF ¶ 26.)  Patrick told Plaintiff that the decision to remain part-time or transition to full-time was "totally in [his] court."  (DSMF ¶ 27.)  Patrick asked Plaintiff directly whether there was a reason he required a part-time schedule, and Patrick did not tell Patrick that he required part-time work as a result of a medical condition. (DSMF ¶ 29.)

Patrick and Plaintiff discussed whether Plaintiff could obtain project work from other teams to fill his schedule for the extra 8 hours of work rather than taking additional customer calls. (DSMF ¶ 30.)  In a subsequent discussion with Dunphy, Plaintiff said he

would like to move to a full-time schedule; Dunphy stated he would try to find project

work to fill the additional time so that Plaintiff's phone work would be limited to 32 hours

each week.  (DSMF ¶ 31.)  Patrick agreed to the plan.  (*Id.*)

At Patrick's direction, on November 30, 2016, Dunphy sent an email to Plaintiff

and Patrick summarizing the discussions.  The email stated in part:

> We agreed to the following:
>
> Effective immediately Adam Flanders will now have a 40hr a week schedule.
> For the month of December, every Friday . . . Adam will take 8hrs of PTO
> for a total of 40hrs of PTO up until the end of the year.  Following the end of
> December Adam will then work a schedule of 32hrs worth of phone time on
> the TIES team . . . and 8hrs of project time a week.
>
> .     .     .
>
> Scheduling for project time will *likely* be done in one day blocks, or two half
> day blocks, but it is subject to vary by days and hours depending on needs
> for phone coverage and subject to vary week-by-week as we review coverage
> needs.

(DSMF ¶ 32 (emphasis in original).)

Plaintiff understood this email to constitute a new employment contract with

Defendant or a modification of his existing contract.  (DSMF ¶ 33; POSMF ¶ 33.)  Patrick

and Dunphy understood that Plaintiff remained an at-will employee, and that the

arrangement summarized in the November 30 email to require Plaintiff to work 32 hours

of phone time each week in order to be assigned the full 8 hours of project time, and that

his project time would be reduced if he did not work 32 hours of phone time. (DSMF ¶¶

34-35.)  Patrick and Dunphy also understood the arrangement for Plaintiff to receive 8

hours of project work each week to be contingent on Defendant's general business needs,

including the need for additional phone coverage for customer calls and the actual

availability of project work. (DSMF ¶ 36.) Plaintiff did not share Dunphy's and Patrick's understanding that he would not receive a full 8 hours of project work during weeks when he worked fewer than 32 hours of phone time. (DSMF ¶ 37.)

In early 2017, Plaintiff was regularly assigned project work in addition to his phone duties, but he contends that he did not consistently receive 8 hours of project time each week. (DSMF ¶ 38.) For example, on January 27, 2017, Plaintiff reported that he believed he should be assigned additional project work that week because he had been assigned only 4.5 hours the previous week. (DSMF ¶ 39.) Dunphy told Plaintiff to be assigned 8 hours of project time, he needed to work 32 hours of phone time, and that he had worked from home two days the previous week, which reduced his phone time. (DSMF ¶ 40.)

On December 28, 2016, while Plaintiff was still working 32 hours per week, he filed a letter of resignation in Defendant's human resources information system (called Workday), stating in part:

> I have wanted to leave Maine for some time now. I have struggled with depression that often becomes severe in the winter months due to the added impact of Seasonal Affective Disorder. I have had to miss work at athenahealth, including taking a temporary medical leave and short-term disability in Fall 2015, due to my depression. I don't believe I can do my best work in Maine and at this time there are no options available for me with athenahealth in Manila or San Francisco.
>
> I have discussed my decision with Joseph Dunphy and Christian Mahon, and Jessica Patrick has been informed. I have family in Southern California who have offered me help in moving. I think I will have a happier, healthier life there. I intend that my last day will be January 13, 2016 [sic]. I will continue to explore remote positions with athenahealth as they become available.

(DSMF ¶ 41.)

The primary reasons for Plaintiff's resignation were that Dunphy had recently

informed him that moving to the Product Knowledge team as part of the transition of the CCP Device Tech team—one of the team transfer options they had previously discussed—would not be an option, and because Plaintiff's seasonal depression had begun to worsen. (DSMF ¶ 42.)  Plaintiff also decided to resign because he had not received a promotion, which he alleges would have been a transfer to a non-call position, one of the accommodations he requested, because he did not feel challenged by his work, and because he did not believe his level of work and pay was commensurate with his education and experience.  (DSMF ¶ 43; POSMF ¶ 43.)

After submitting his resignation, Plaintiff spoke with Dunphy, who tried to convince him to stay. (DSMF ¶ 44.)  Dunphy emphasized that Plaintiff would not be eligible to receive his 2016 bonus unless he remained employed until mid-February when bonuses were paid. (DSMF ¶ 44.)  The same evening Plaintiff filed his resignation in the Workday system, he withdrew it; he told Dunphy and his supervisor, Christian Mahon, the following day that he planned to revisit a possible remote position or job transfer, or he would resign in mid-February.  (DSMF ¶¶ 44, 45; POSMF ¶ 44.)

On December 29, 2016, Plaintiff emailed human resources business partner Deb Bartol to explain that he had withdrawn his resignation. (DSMF ¶ 46.)  Bartol asked Plaintiff to clarify his plans and offered to meet if he preferred.[4]  (DSMF ¶ 47.)  Plaintiff

---

[4] On December 29, Bartol emailed Stephen Taylor, Defendant's CSC Senior Manager, regarding the possibility of a position for Plaintiff in Manila.  (Plaintiff's Decl., Ex. F, ECF No. 37-6.)  Taylor responded that they "have talked about that before but his personality wouldn't mesh well with the team over there." (*Id.*)  Kelly Dionne, who was responsible for managing Defendant's Manila start-up team, states that Plaintiff did not have the requisite training for this position.  (Dionne Decl. ¶¶ 4, 6-7, ECF No. 31.)  Plaintiff testified that he agreed that he needed to gain additional training for the position, as well.  (Plaintiff's Dep.,

explained that he deferred his resignation because his move to California had been delayed due to family circumstances, and because he wanted an opportunity to explore remote positions that might allow him to remain with Defendant. (DSMF ¶ 48.)  Plaintiff also planned to work longer to save money for an upcoming family cruise in March, although he did not disclose this to Bartol.[5]  (DSMF ¶ 49.)

Bartol responded by asking if Plaintiff had considered a transfer to Atlanta, which also had a CSC similar to the Belfast location where he worked.  (DSMF ¶ 50.)  Plaintiff responded that he was open to that possibility, and Bartol suggested that they meet in person to talk about options.  (*Id*.)

On January 19, 2017, Plaintiff met in person with Bartol to further discuss his plans.  (DSMF ¶ 51.)  Plaintiff told Bartol that he had been thinking of leaving Maine for some time and wanted to live with family in California.  (*Id*.)  He also told Bartol that he could not work from home in his current position and that he had been unable to find any other open positions for which he was qualified.[6]  (DSMF ¶ 52.)   Bartol again raised the possibility of a transfer to Atlanta, which would mean returning to work in a CSC.  (DSMF ¶ 53.) Prior to the January 19 meeting, however, Plaintiff had already contacted state officials in Georgia to inquire as to whether certain restrictions relating to his past criminal

---

69:10-17; 72:24-73:7.)

[5] In discussing the possibility of a transfer to Atlanta through a series of emails with Bartol, Plaintiff explained that winter was hard for him and that he had struggled with depression for most of his life, and that he had tried to remedy it with counselling, medication, light therapy, and exercise.  (Plaintiff's Dep., Ex. 13, ECF No. 27-7.)

[6] Plaintiff maintains that occasionally he had the option to work from home.  (Plaintiff's Decl. ¶ 9.)

record would prevent him from working at Defendant's location in Atlanta, and he had learned that he would not be legally permitted to work in that office. (DSMF ¶ 60.)  Plaintiff did not disclose this information to Bartol.  (*Id*.)

Plaintiff did not tell Bartol that his medical conditions prevented him from doing full-time call work, nor did he say anything to suggest that he experienced stress related to call work. (DSMF ¶ 54.)  Bartol asked whether Plaintiff needed any other assistance from Defendant and explained that Defendant would "bend over backwards to help as much as we can," and Plaintiff responded that he could not think of anything. (DSMF ¶ 55.)

Bartol also told Plaintiff that if he needed a leave of absence, he should contact Matrix Absence Management (Matrix), Defendant's third-party leave administrator. (DSMF ¶ 56.)  Plaintiff does not recall following up with Bartol after their January 19 discussion. (DSMF ¶ 57.) Plaintiff hoped that Bartol would try to find him an accommodation. (POSMF ¶ 57.)  Plaintiff did not seek a leave of absence in early 2017 to continue to search for a suitable transfer opportunity, because, Plaintiff asserts, he did not know it was an option.  (DSMF ¶ 58; POSMF ¶ 58.)

By January 2017, Plaintiff had committed in his mind to move to California, and he believed he could not be accommodated in his current position.  (DSMF ¶ 59.)  Plaintiff no longer considered working from home or working part time to be acceptable options. (*Id*.)  Plaintiff would have accepted reassignment to a position in a warmer climate and "probably would have" accepted a transfer to a non-call team in Belfast.  (*Id*.)[7]

---

[7] During his exit interview, Plaintiff wrote that "I would have gone to Manila and I also discussed remote opportunities with my manager (I can and am willing to do all the work I do now remotely from California,

On February 14, 2017, Defendant delivered to Plaintiff via direct deposit his 2016 bonus, and Plaintiff submitted his resignation the same day, with an effective date of March 3, 2017. (DSMF ¶ 61.)  In the resignation letter, Plaintiff wrote that he wanted to leave Maine to live with family in California and that he would continue to explore remote positions with Defendant. (*Id.*; POSMF ¶ 61.)  At the time of Plaintiff's March 3 resignation, there were ten vacant postings for a Client Services Analyst position in Defendant's Atlanta office.  (DSMF ¶ 62.)

During certain meetings with Plaintiff in 2016, Dunphy allegedly made two statements to Plaintiff related to Plaintiff's sexual orientation. (DSMF ¶ 63.) When Plaintiff and Dunphy discussed Plaintiff's interest in a position in Chennai, India, Dunphy allegedly suggested that Plaintiff wanted to go to India because of the sexual acts Indian men could perform with their mustaches.  (DSMF ¶ 64.)  Dunphy also purportedly referenced this joke in his notes regarding the position in India, writing, "Potential interest in [athenahealth India] (minus the mustaches)?" (Plaintiff's Dep., Ex. 5, ECF No. 27-3.)  On another occasion, Dunphy allegedly commented that Plaintiff's interest in a transfer to the Manila location was because Plaintiff wanted to have sex with Filipino men. (DSMF ¶ 65.) Plaintiff did not tell Dunphy that he was offended by his comments and did not report Dunphy's comments to his supervisor or to human resources. (DSMF ¶ 68.)

Two of Plaintiff's coworkers on the TIES team also allegedly made approximately three jokes about his sexual orientation during his employment. (DSMF ¶ 67.)  One of the

---

without any special accommodations or pay raise) …."  (POSMF ¶ 59 (citing Plaintiff's Dep., Ex. 15, ECF No. 35-4.))

jokes was to the effect that "there was only one kind of meat [Plaintiff] ate," and the other two jokes were related to people being gay, but Plaintiff does not recall the details of the jokes. (*Id.*)

During Plaintiff's employment, Defendant had a written Anti-Discrimination Policy which prohibited discrimination and harassment against employees based on any legally protected status, including sexual orientation. (DSMF ¶ 69.) The Anti-Discrimination Policy directed employees to report suspected violations of the policy to certain named members of senior management, any of Defendant's human resources business partners, or any member of Defendant's compliance team. (*Id.*) Plaintiff received and read a copy of the Anti-Discrimination Policy when he was hired, and he understood that he could report violations to human resources. (DSMF ¶ 70.)

Plaintiff asserts claims for disability discrimination, sexual orientation discrimination, and breach of contract. (Complaint, ECF No. 1.)

## DISCUSSION

### A. Decision of the Unemployment Insurance Commission

Plaintiff argues that a decision of the Maine Department of Labor Unemployment Insurance Commission (UIC) is conclusive as to the parties' dispute. On March 4, 2017, Plaintiff filed an unemployment claim. (Plaintiff's Decl. ¶ 13, ECF No. 37.) The UIC issued a decision favorable to Plaintiff on August 1, 2017, setting aside an earlier unfavorable decision by an administrative hearing officer. (Plaintiff's Decl. at 6, Ex. H, ECF No. 37-8.) Defendant objects to Plaintiff's efforts to use the findings in the UIC decision as evidence to support his opposition to the summary judgment motion.

Defendant argues the UIC decision is inadmissible hearsay.

"[W]hen a state agency acting in a judicial capacity resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate, federal courts must give the agency's factfinding the same preclusive effect to which it would be entitled in the State's Courts." *Univ. of Tenn. v. Elliot*, 478 U.S. 788, 799 (1986) (citation and internal punctuation omitted). As this Court has noted, under Maine law, "factual findings included in a final adjudication in an administrative proceeding have the same preclusive effect as those made in a court proceeding." *Archer v. Town of Houlton*, No. 00-244-B-H, 2001 WL 1057708, at *5 (D. Me. Sept. 12, 2001) (citing *Peterson v. Town of Rangeley*, 715 A.2d 930, 933 (Me. 1998)).

Where the parties to a subsequent action are the same but the causes of action are different, Maine courts recognize that collateral estoppel potentially applies. *Cianchette v. Verrier*, 155 Me. 74, 89, 151 A.2d 502 (1959). "In such a case, the prior judgment is only conclusive upon the issues actually tried." *Sewall v. Taylor*, 672 F. Supp. 542, 543 (D. Me. 1987) (citing *Bray v. Spencer*, 146 Me. 416, 82 A.2d 794 (1951)). Moreover, "the concept of collateral estoppel cannot apply when the party against whom the earlier decision is asserted did not have a full and fair opportunity to litigate that issue in the earlier case." *Allen v. McCurry*, 449 U.S. 90, 95 (1980) (citation and internal quotation marks omitted).

In *Sewall*, the plaintiff alleged that the defendants violated his First and Fourteenth Amendment rights when he was discharged from his job at the Portland Water District. 672 F. Supp. at 543. The plaintiff had earlier filed a claim for unemployment compensation based on a claim for wrongful discharge and the UIC affirmed a decision granting plaintiff

unemployment benefits. *Id.* The plaintiff moved in limine to estop the defendants from relitigating certain factual issues determined by the UIC in its decision.  The Court wrote,

> the use of offensive collateral estoppel to preclude relitigation of the …
> factual issues would be inappropriate in this case.  As noted above, the legal
> issues presented before this Court and those decided by the administrative
> tribunal are not identical. Defendants' potential liability in the state
> administrative unemployment proceeding is far less than it is in a suit for
> unlawful discharge brought pursuant to 42 U.S.C. § 1983.  For both parties,
> there is less incentive to exhaustively litigate in an unemployment
> compensation hearing the factual issues that are subject to litigation in a
> subsequent § 1983 action.  It would be unfair to permit the use of collateral
> estoppel under these circumstances. *Nickens v. W.W. Grainger, Inc.*, 645 F.
> Supp. [569,] 571 [(W.D. Mo. 1986)].  Maine courts have long recognized
> that the use of collateral estoppel should be permitted on a case-by-case basis
> and should not be sanctioned where it would be unfair to a party or where it
> would not serve the ends of justice.

*Id.* at 545.

The analysis of the Court in *Sewall* is sound and applicable here.  In this case, as in *Sewall*, the parties in interest are the same, but the causes of action and issues are not.  In the UIC proceeding, Plaintiff sought unemployment insurance benefits. In this matter, Plaintiff asserts claims of discrimination and breach of contract, which claims generate issues and require evidence that were not relevant to the administrative proceeding.  As in *Sewall*, there was less incentive or need for the parties to litigate all the issues in that proceeding.  Indeed, Defendant did not appear at the UIC proceeding, and presented no evidence to rebut Plaintiff's evidence presented in that proceeding.  (Plaintiff's Decl., Ex. H at 5.)  To apply collateral estoppel in this case would be unfair to Defendant and would not serve the ends of justice.  *See Id.*; *see also Archer*, 2001 WL 1057708, at *6.

### B.  Disability Discrimination (Reasonable Accommodation)

Plaintiff's disability discrimination claim is based on Defendant's alleged failure to accommodate, which claim arises under the Americans with Disabilities Act.   As summarized by the First Circuit:

> Reasonable accommodations are modifications or adjustments to the work environment, or to the manner in which the position's duties are customarily performed, that enable a qualified individual with a disability to perform the essential functions of that position. *See* 29 C.F.R. § 1630.2(*o*).  An employer is obligated to provide a reasonable accommodation (as long as it is not unduly burdensome) where a protected employee has requested an accommodation or the employer otherwise knew that one was needed.  *See Jones v. Nationwide Life Ins. Co.,* 696 F.3d 78, 89 (1st Cir. 2012). The employee's request for an accommodation, however, "must be sufficiently direct and specific, and it must explain how the accommodation is linked to the [employee's] disability" in order to trigger the employer's responsibility to accommodate. *Id.; see Ocean Spray Cranberries, Inc. v. Mass. Comm'n Against Discrimination,* 441 Mass. 632, 808 N.E.2d 257, 267–68, 270–71 (Mass. 2004).

*Murray v. Warren Pumps, LLC*, 821 F.3d 77, 84 (1st Cir. Apr. 2016).

Defendant argues that a factfinder could not reasonably conclude that Defendant failed to offer a reasonable accommodation because (1) Plaintiff did not require a reasonable accommodation; (2) Plaintiff never made a sufficiently specific request for accommodation; (3) Plaintiff proposed unreasonable accommodations; (4) Plaintiff failed to participate in the interactive process; and (5) Plaintiff rejected a suitable and reasonable accommodation.

To request an accommodation for a disability, an employee must give the employer notice of the need for a special accommodation using sufficiently direct and specific language.  *Calero–Cerezo v. U.S. Dep't of Justice*, 355 F.3d 6, 23 (1st Cir. 2004).  That is,

"a request for accommodation must be reasonably specific" and "must comprise more than a cryptic communication to be deciphered by the recipient." *Miceli v. JetBlue Airways Corp.*, 914 F.3d 73, 83 (1st Cir. 2019). "In some cases, a request for a reasonable accommodation may trigger a responsibility on the part of the employer to enter into an interactive process with the employee to determine an appropriate accommodation." *Calero-Cerezo*, 355 F.3d at 23.  As part of the interactive process,

> the employer is "expected to engage in a meaningful dialogue with the employee to find the best means of accommodating that disability.  Although the degree of interaction required varies in accordance to the circumstances of each case, the process requires open communication by both parties, and an employer will not be held liable if it makes reasonable efforts both to communicate with the employee and provide accommodations based on the information it possessed.

*Enica v. Principi*, 544 F.3d 328, 338-39 (1st Cir. 2008) (citations and quotation marks omitted).

Plaintiff's discussions with Dunphy about other job opportunities with Defendant does not constitute a request to accommodate a disability. First, as explained below (*see* Section C), Dunphy is not a supervisor or otherwise part of Defendant's management. Conversations with Dunphy, therefore, do not constitute a request of Defendant for an accommodation.  In addition, Plaintiff's conversations with Dunphy regarding the stressful nature of the call position do not qualify as a request for an accommodation for a disability. At a minimum, Plaintiff did not link his desire for another position to a disability. *See Reed v. LePage Bakeries, Inc*., 244 F.3d 254, 261 (1st Cir. 2001) ("At the least, the request must explain how the accommodation requested is linked to some disability").

To the extent that Plaintiff's 2016 resignation letter or his subsequent discussions

with Dunphy could be construed as a request for an accommodation through a transfer to another position/location, Defendant engaged in the required interactive process with Plaintiff in an effort to accommodate Plaintiff.  The record reflects that in 2016 and 2017, Dunphy and others helped Plaintiff explore other possible positions with Defendant, but Plaintiff did not find a suitable position for which he was qualified.  Defendant was not required to create a new job for Plaintiff. *Audette v. Town of Plymouth*, 858 F.3d 13, 21 (1st Cir. 2017).

Furthermore, after Plaintiff submitted his December 2016, resignation letter, Dunphy continued his discussions with Plaintiff and convinced Plaintiff to rescind his resignation and explore other opportunities with Defendant.  Defendant, through Deb Bartol, contacted Plaintiff and suggested that he transfer to Defendant's Atlanta office, where there were several vacant positions for which Plaintiff was qualified.  (DSMF ¶¶ 50, 55, 62.)  Such a transfer would address Plaintiff's stated desire to live in a warmer, sunnier climate and Plaintiff had previously indicated a willingness to relocate. (DSMF ¶ 50.) While Plaintiff maintains that the Atlanta accommodation was not reasonable because he concluded that legally, he was unable to work in the state of Georgia, Plaintiff never informed Bartol of this fact. (DSMF ¶ 60.) Bartol also suggested a leave of absence. (DSMF ¶ 56.)  Although Plaintiff contends that he hoped that Bartol would try to find him some other accommodation, he never followed up with her. (POSMF ¶ 57; DSMF ¶ 57.) Plaintiff failed to discuss further with Bartol her suggestions, but instead submitted a letter

of resignation soon after their conversation.[8]  Under the circumstances, Plaintiff's assertion that he expected Bartol to follow-up is unavailing.  *Freadman v. Metro. Prop. & Cas. Ins. Co.*, 484 F.3d 91, 105 (1st Cir. 2007) ("We reject plaintiff's proposition that employees who make requests have no obligation to further clarify their needs once the employer offers an accommodation the employee believes is insufficient").  In short, Plaintiff's failure to continue the dialogue precludes recovery on his accommodation claim.  *Enica*, 544 F.3d at 340 ("[A]bsent any communications from [the plaintiff] regarding the inadequacy of h[is] accommodations, no factfinder could hold the [defendant] responsible for either a breakdown in the interactive process or failing to correct an inadequate accommodation since it was not made aware that a deficiency existed.").

## C. Discrimination Based on Sexual Orientation

Plaintiff claims that during his employment with Defendant, he was subjected to discrimination/harassment due to his sexual orientation.  As the parties note in their Joint Statement of Case Authorities (ECF No. 42), the Supreme Court recently held that sexual orientation discrimination constitutes discrimination on the basis of sex and is actionable under Title VII.  *Bostock v. Clayton Cty., Ga.*, -- U.S. --, 140 S. Ct. 1731, 20 L.Ed.2d 218 (2020).

Plaintiff appears to base his discrimination claim on a hostile work environment. (Plaintiff's Resp. at 16-17, ECF No. 35.)  To establish a hostile work environment, a plaintiff must show that his workplace was "permeated with discriminatory intimidation,

---

[8] Plaintiff met with Bartol on January 19, 2017; Plaintiff submitted his letter of resignation on February 14, 2017, the same day he received his 2016 bonus.

ridicule, and insult that [was] sufficiently severe or pervasive to alter the conditions of ...

[his] employment and create an abusive working environment." *Colón-Fontánez v.*

*Municipality of San Juan*, 660 F.3d 17, 43 (1st Cir. 2011) (alterations in original) (quoting

*Quiles-Quiles v. Henderson*, 439 F.3d 1, 7 (1st Cir. 2006)).

Plaintiff points to two comments made by Dunphy regarding Plaintiff's sexual

orientation, and three jokes made by two other co-workers as the bases of his claim. (DSMF

¶¶ 63-67.) The severity of the allegedly hostile conduct, its frequency, and whether it

unreasonably interfered with the victim's work performance are all relevant factors in

distinguishing between "the ordinary, if occasionally unpleasant, vicissitudes of the

workplace and actual harassment." *Noviello v. City of Boston*, 398 F.3d 76, 92 (1st Cir.

2005). Courts agree "that ... 'isolated incidents (unless extremely serious) will not amount

to discriminatory changes in the terms and conditions of employment' to establish an

objectively hostile or abusive work environment." *Colón-Fontánez*, 660 F.3d at 44

(internal quotations omitted) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788

(1998)). Defendant contends that while the statements might be offensive, the statements

do not support a hostile work environment claim.

The Court, however, does not have to make that assessment. To establish employer

liability for a non-supervisory co-employee, a plaintiff must demonstrate that the employer

knew or should have known of the alleged sexual harassment and failed to implement

prompt and appropriate action. *Forrest v. Brinker Int'l Payroll Co., LP*, 511 F.3d 225, 230

(1st Cir. 2007). Plaintiff evidently contends that because of Dunphy's management status,

Defendant is liable for Dunphy's conduct. Contrary to Plaintiff's contention, the record

establishes that Dunphy was not a manager or supervisor.  Dunphy did not have the authority to hire, fire, demote, promote, transfer, or discipline employees, and had no role in evaluating an employee's performance. (DSMF ¶ 7)[9] *See Wilson v. Moulison North Corp.*, 639 F.3d 1, 9 (1st Cir. 2011) (a supervisor has the authority to hire, fire, demote, promote, transfer, or discipline).  The fact that Dunphy was the team leader does not alter the analysis. *Id*. at 10 (a title, such as foreman, "does not transmogrify a line employee into a supervisor for Title VII purposes.")

Because Plaintiff cannot rely on Dunphy's alleged involvement in or knowledge of the statements to establish Defendant's liability, and because Plaintiff did not report the alleged harassment to anyone in Defendant's management (DSMF ¶ 68), Plaintiff cannot prevail on his sexual orientation discrimination claim.

### D.  Breach of Contract/Promissory Estoppel

Plaintiff first alleges that Defendant breached an implied employment contract when, after working part-time with full benefits for over a year, Defendant notified Plaintiff that an error had occurred, and that accrual of his paid time off and holiday pay benefits would be reduced to reflect his part-time status unless he resumed full-time work. (Complaint ¶¶ 59-62.)

"An implied contract 'refers to that class of obligations which arises from mutual agreement and intent to promise, when the agreement and promise simply have not been expressed in words.'" *Campbell v. First American Title Ins. Co.*, 644 F. Supp. 2d 126, 136

---

[9] Plaintiff asserts Dunphy "acted" like an assistant manager. (POSMF ¶ 6-7.)  However, "an employee's subjective belief is insufficient to create a triable issue of material fact about a coworker's status." *Wilson*, 639 F.3d at 10.

(D. Me. July 2, 2019) (quoting *Stanton v. Univ. of Maine Sys.,* 773 A.2d 1045, 1050 (Me. 2001)).  "'A contract exists if the parties mutually assent to be bound by all its material terms, the assent is either expressly or impliedly manifested in the contract, and the contract is sufficiently definite to enable the court to ascertain its exact meaning and fix exactly the legal liabilities of each party.'" *Id.* (quoting *Sullivan v. Porter*, 681 A.2d 625, 631 (Me. 2004)).  Neither the Employment Agreement nor any communications between the parties could reasonably be construed to establish a contractual agreement, implied or express, by which Plaintiff was entitled to full-time benefits for part-time work.

Plaintiff also argues that Defendant breached the terms of the parties' November 30, 2016, agreement by requiring him to perform call work beyond the 32 hours of phone time to which he agreed and by not assuring that he had 8 hours of project work each week.  (Complaint ¶¶ 63-64.)  The email provides:

> Effective immediately Adam Flanders will now have a 40hr a week schedule. For the month of December, every Friday . . . Adam will take 8hrs of PTO for a total of 40hrs of PTO up until the end of the year.  Following the end of December Adam will then work a schedule of 32hrs worth of phone time on the TIES team . . . and 8hrs of project time a week.
>
> .       .       .
>
> Scheduling for project time will *likely* be done in one day blocks, or two half day blocks, but it is subject to vary by days and hours depending on needs for phone coverage and subject to vary week-by-week as we review coverage needs.

(DSMF ¶ 32.)  Defendant contends that the email writing is too vague and indefinite to be enforceable.  (Motion at 19, ECF No. 25.)

While there might be multiple ways to interpret the agreement, one reasonable interpretation is that the parties agreed that Plaintiff would have 8 hours of project time

each week and the day or days of the week he would work on the project would depend on the phone coverage needs.  Defendant's argument that the terms of the agreement are too vague to be enforced is not persuasive.

At most, however, the November 30 email amended the parties' Employment Agreement, which provides that Plaintiff is an at-will employee.  The November 30 email did not alter Plaintiff's at-will status.[10] Defendant, therefore, had the unilateral ability to end or alter the terms of Plaintiff's employment.  "'[A] reservation to either party of an *unlimited* right to determine the nature and extent of his performance renders his obligation too indefinite for legal enforcement, making it, as it is termed, merely illusory.'" *Snow v. BE&K Constr. Co.*, 126 F. Supp. 2d 5, 14 (D. Me. 2001) (quoting RESTATEMENT (SECOND) OF CONTRACTS §§ 2 cmt. e, 77 & cmt. a (1981) (emphasis in original).  Plaintiff thus cannot proceed on his breach of contract claim.

Even if the November 30 email constituted an enforceable contract, Defendant would still be entitled to summary judgment because he has not suffered an economic loss as the result of the alleged breach.  Plaintiff contends he was required to work more on a task (i.e., the phone calls) that caused him stress.  Plaintiff cannot recover emotional distress damages on a breach of contract claim.  *McAfee v. Wright*, 651 A.2d 371, 372 (Me. 1994).  For the same reason, Plaintiff cannot recover on his promissory estoppel claim. *See, e.g., Anderson v. Suiters*, 499 F.3d 1228, 1239 (10th Cir. 2007) (applying Oklahoma law and concluding that the "proposed promissory estoppel claim fails because she only

---

[10] The Employment Agreement provides "that the provisions of this Agreement shall apply regardless of any change in Employee's compensation, duties, responsibilities, role, reporting structure, or title during the course of the Employment Period." (Molly Montgomery Decl., Exh. B, ECF No. 29-2.)

alleges emotional distress damages"); *Zenor v. El Paso Healthcare Sys., Ltd.*, 176 F.3d 847, 866 (5th Cir. 1999) ("Texas law generally does not allow mental anguish damages for breach of contract. This principle extends to promissory estoppel claims since promissory estoppel claims are contractual in nature") (citation omitted); *Wyatt v. BellSouth, Inc.*, 757 So. 2d 403, 408 (Ala. 2000) ("The doctrine of promissory estoppel should not be used as a basis for awarding damages that would not, under general principles of contract law, be recoverable in an action for breach of contract"); *Deli v. Univ. of Minnesota*, 578 N.W.2d 779, 783 (Minn. Ct. App. 1998) ("Because promissory estoppel is a contract-based claim, to recover emotional distress damages, Deli was required to plead and prove the existence of an independent tort"); *Smith v. Bridgeport Futures Initiative, Inc.*, No. 326697, 1996 WL 493229, at *1–3 (Conn. Super. Ct. Aug. 16, 1996) (plaintiff could not recover damages for emotional distress or for injury to career or reputation in action sounding in contract and promissory estoppel absent a tort based on negligent or intentional infliction of emotional distress).

## CONCLUSION

Based on the foregoing analysis, I recommend the Court grant Defendant's motion for summary judgment.

## NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum, within fourteen (14) days of being served with a copy thereof. A responsive memorandum shall be filed within fourteen (14) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.

/s/ John C. Nivison
U.S. Magistrate Judge

Dated this 16th day of October, 2020.